# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Professionals Direct
Insurance Company,

       Plaintiff,

-V-                                         Case No. 2:06-CV-240
                                                 JUDGE SMITH
                                                 Magistrate Judge Abel

Wiles, Boyle, Burkholder &
Bringardner Co., LPA,

       Defendant.

## OPINION AND ORDER

Plaintiff Professionals Direct Insurance Company ("PDIC") brings this action for declaratory judgment against Defendant Wiles, Boyle, Burkholder & Bringardner Co., LPA ("Wiles"), seeking a declaration by the Court that PDIC is under no duty to defend Wiles in a pending lawsuit in state court in Ohio, or to indemnify Wiles for any damages that may be awarded in that lawsuit, and that PDIC is entitled to reimbursement for its prior expenses in defense of that lawsuit. Wiles has answered PDIC's complaint and counterclaimed for breach of contract and bad faith relating to PDIC's actions pursuant to a professional responsibility insurance policy PDIC issued to Wiles. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a), in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states. This matter is before the Court on PDIC's Motion for Summary Judgment, seeking judgment on its Complaint of Declaratory

Judgment against Wiles (Doc. 54). For the reasons stated below, the Court **DENIES** Plaintiff

PDIC's Motion for Summary Judgment (Doc. 54).


## I.    BACKGROUND

PDIC is a national insurance company that provides professional liability/malpractice

insurance to law firms.  Wiles is a law firm to whom PDIC provided such insurance.

### A.    Underlying Action

In 2001, Wiles was retained by Illinois National Insurance Company ("Illinois National")

to defend a suit against an employee of one of Illinois National's insureds.  The lawsuit proceeded

to trial on October 7, 2002.  The plaintiffs obtained a large jury verdict, leaving Illinois National

responsible for $8,531,488.68 in damages.  The trial court entered judgment December 30, 2002.

Wiles, on behalf of Illinois National, filed a motion for judgment notwithstanding the verdict or,

alternatively, for a new trial on January 15, 2003.  On February 10, 2003, the plaintiffs filed a

motion to strike Wiles' post-trial motions, arguing that they were untimely.  On March 4, 2003,

the trial court agreed with plaintiffs, denying the motions as untimely.

On March 13, 2003, Wiles, on behalf of Illinois National, filed a Notice of Appeal, to the

Twelfth District Court of Appeals, appealing (1) the December 30, 2002 Judgment Entry; (2) the

trial court's denial of Illinois National's Motion for JNOV; and (3) the trial court's denial of

Illinois National's Motion for a New Trial.  On March 19, plaintiffs filed a Motion to Dismiss the

Appeal, arguing the post-trial motions were untimely because they were not filed within the 14-

day period required by Ohio Civil Rules 50(B) and 59(B), Illinois National's 30-day time period

for filing its Notice of Appeal was not tolled, and Illinois National's time period for filing the

Notice of Appeal had expired prior to March 13, 2003.

On March 28, 2003, Wiles filed a Memorandum in Opposition, arguing that Ohio Civil Rule 6(E)—the "mail rule"—applied to the December 30, 2002 Judgment Entry of the trial court, allowing Wiles three additional days beyond the 14-day period to file the post-trial motions, making the January 15, 2003 post-trial motions timely. Wiles further argued that because Illinois National's time to file its Notice of Appeal was tolled until the last of the post-trial motions was disposed of by the trial court (which was March 4, 2003), Illinois National's March 13, 2003 Notice of Appeal was timely pursuant to Ohio Rule of Appellate Procedure 4(B)(2).

On May 8, 2003, the Twelfth District Court of Appeals dismissed Wiles' appeal of the December 30, 2002 Judgment Entry. The appeal of the trial court's denial of Illinois National's post-trial motion of JNOV, and also its motion for a new trial, remained pending. On May 16, 2002, Wiles, on behalf of Illinois National, filed a Motion to Certify Conflict in the Court of Appeals. On June 12, 2003, the Twelfth District Court of Appeals agreed there was a conflict and certified the conflict. On July 30, 2003, the Ohio Supreme Court determined a conflict existed between the courts of appeal on the following issue:

> Whether Civ. R. 6(E) extends the time for filing a motion for new trial under Civ.R. 59(B) or motion for judgment notwithstanding the verdict under Civ.R. 50(B) beyond 14 days after the entry of judgment when the judgment entry is mailed to the parties.

The parties briefed their arguments to the Ohio Supreme Court between October 14, 2003 and November 26, 2003. On August 18, 2004, the Ohio Supreme Court issued its decision, affirming the dismissal of Illinois National's appeal of the December 30, 2002 Judgment Entry for lack of timeliness, and holding that Ohio Civil Rule 6(E) did not apply to the December 30, 2002

Judgment Entry and Illinois National's post-trial motions.

**B.    The Policies**

PDIC first issued a malpractice insurance policy to Wiles on November 15, 2002.  The policy period was from November 15, 2002 through November 15, 2003 ("2002-2003 Policy"). The policy was renewed for another year on November 15, 2003 through November 15, 2004 ("2003-2004 Policy").[1]  These policies were "claims-made" policies, and each policy provided coverage up to $5,000,000.

Both the 2002-2003 Policy and the 2003-2004 Policy were "claims-made" policies.  The 2002-2003 Policy provided in pertinent part:

**IMPORTANT NOTICE**

**THIS IS A CLAIMS-MADE FORM.  COVERAGE IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY OR ITS AUTHORIZED AGENTS DURING THE POLICY PERIOD. PLEASE READ AND REVIEW THIS INSURANCE POLICY CAREFULLY.**

**SECTION 1. COVERAGE**

**1.1.  WHAT THIS POLICY INSURES**

**We** will pay on behalf of the **Insured** all sums up to **our** limit of liability and in excess of the deductible shown in Item 5 of the Declarations which the **Insured** shall become legally obligated to pay as **damages** because of any **claim** or **claims** for **personal injury**, first made against the **Insured** and first reported to the **Company** during the **policy period**, arising from any act, error or omission which first occurred on or after the applicable **Retroactive Dates**, provided:

>    a)    The **claim** arises out of the rendering of or the failure to render **professional services;** and

---

[1]The policy was renewed again for another year on November 15, 2004 through November 15, 2005.  The policy was not renewed for an additional year after this.

b) The **claim** is caused by an **Insured** under this **policy** or by any person for whose acts, errors or omissions the **Insured** is legally liable; and

c) The **Insured** had no knowledge of facts which could have reasonably been expected to result in the **claim**, or any knowledge of the **claim**, prior to the effective date of this **policy**; and

d) There is no other insurance policy which provides coverage for the **claim.**

## 1.2. WHEN A CLAIM IS FIRST MADE

A **claim** is first made against the **Insured** at the earlier of the following:

a) when the **Insured** first receives written notice that a **claim** has been made; or

b) *when the **Insured** first receives information or has knowledge of specific circumstances involving a particular person or entity which could reasonably be expected to result in a **claim***.

All **claims** arising out of a single act, error or omission or a series of related acts, errors or omissions arising from the rendering of or failure to render **professional services** on behalf of a single client shall be deemed to be one **claim** and to be first made when the first of such **claims** is made.

## 1.3. WHEN A CLAIM IS FIRST REPORTED

A **claim** is first reported to the **Company** at the earlier of the following:

a) when the **Company** or any of its authorized agents first receives notice from the **Insured** that a **claim** has been made; or

b) when the **Company** or any of its authorized agents first receives notice from the **Insured** of the specific circumstances involving a particular person or entity which could reasonably be expected to result in a **claim.**

Any **claim** arising out of the same, related or continuing **professional services** which resulted in a **claim** prior to the first **policy** issued to the **Named Insured** by **us**, whether or not the **claim** was reported to any prior insurer, is not covered under the **policy.**

\*      \*      \*

**SECTION 5. EXTENDED REPORTING PERIOD OPTION**

The **Named Insured** may purchase an Extended Reporting Period Endorsement if this **policy** is canceled or not renewed, or if the **Company** offers renewal under terms and conditions less favorable to the **Named Insured.**

\*      \*      \*

**7.7.  RENEWAL**

The **Company** may offer to renew this **policy** at the terms and rates applicable at the expiration date.  We will not amend the **Retroactive Dates** *during a period of continuous coverage.*

(Compl. at Ex. A) (bold in original, bolded terms denote terms defined in the 2002-2003 Policy)

(emphasis added).

On or about October 14, 2003, Wiles completed a Renewal Application to renew coverage with PDIC.  The Renewal Application contained a section wherein Wiles was asked to respond to a series of questions.  Question seven of this Renewal Application asked:

> 7.      In the last 12 months, has any firm member become aware of any incident, fact, circumstance, act or omission that could result in a professional liability claim against the firm?
> **NOTE:     You should report any incident, facts, circumstances, acts or omissions that *could reasonably be expected* to result in a claim to PDIC within the policy period in order to preserve coverage under your PDIC policy.**

(Compl. at Ex. B). The box labeled "No" next to this question was marked. (*Id.*).

PDIC issued the 2003-2004 Policy to the Wiles firm, and it provides in pertinent part:

**IMPORTANT NOTICE**

**THIS IS A CLAIMS-MADE FORM WITH CLAIM EXPENSES INCLUDED WITHIN THE LIMITS OF LIABILITY, UNLESS OTHERWISE NOTED. THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS WILL BE REDUCED BY AMOUNTS WE PAY FOR CLAIM EXPENSES AS DEFINED IN THE POLICY. COVERAGE IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY OR ITS AUTHORIZED AGENTS DURING THE POLICY PERIOD. PLEASE READ AND REVIEW THIS INSURANCE POLICY CAREFULLY.**

**A. COVERAGE**

**1. WHAT THIS POLICY INSURES**

**We** will pay on **your** behalf all sums which **you** become legally obligated to pay as **damages** because of any **claim** or **claims**, including **claims** for **personal injury,** first made against **you.** The **claim** must first be reported to **us** during the **policy period** and must arise from any act, error or omission covered by this **policy. We** will pay up to **our** limit of liability and in excess of the deductible shown in the Declarations, provided all of the following are true.

    a)    The **claim** must arise out of the rendering of or the failure to render **professional services.**

    b)    The **claim** is caused by an **Insured** under this **policy** or by any person for whose acts, errors or omissions **you** are legally liable.

    c)    The act, error, omission or **personal injury** must have first occurred on or after the applicable **Retroactive Date(s).**

    d)    ***You** had no knowledge of facts which could have reasonably been expected to result in the **claim**, or any knowledge of the **claim**, prior to the effective date of this **policy.***

    e)    There is no other insurance policy which provides coverage for this **claim**.

## 2. WHEN A CLAIM IS FIRST MADE

A **claim** is first made against **you** at the earlier of the following:

    a)    when **you** first receive written notice that a **claim** has been made; or

    b)    *when **you** first receive information or have knowledge of specific circumstances involving a particular person or entity which could reasonably be expected to result in a **claim**.*

All **claims** arising out of a single or series of act(s), error(s) or omission(s) or **personal injury** arising from the rendering of or failure to render **professional services** on behalf of a single client will be considered one **claim.** The **claim** will be first made when the first of these **claims** is made.

## 3. WHEN A CLAIM IS FIRST REPORTED

A **claim** is first reported to **us** at the earlier of the following:

    a)    when **we** or any of **our** authorized agents first receive notice from **you** that a **claim** has been made; or

    b)    when **we** or any of **our** authorized agents first receives notice from **you** of the specific circumstances involving a particular person or entity which could reasonably be expected to result in a **claim.**

\*    \*    \*

## D.    EXCLUSIONS

### 1.    WHAT THIS POLICY DOES NOT INSURE

This **policy** does not apply to:

\*    \*    \*

    s)    *any act, error, omission, **personal injury**, or circumstance that was disclosed or that should have been disclosed in **your** application, whether reported to a prior insurer or not;*

t)      any **claim** arising out of the same, related or continuing
        **professional services** which resulted in a **claim** prior to the first
        **policy we** issued to **you** whether or not the **claim** was reported to
        any prior insurer.

\*      \*      \*

## G. EXTENDED REPORTING PERIOD OPTION

### 1.  ELIGIBILITY AND PREMIUM PAYMENT

**You** may obtain an **Extended Reporting Period** endorsement if **we** or **you** cancel
or do not renew this **policy**, if **we** offer renewal under the terms and conditions
less favorable to **you**, or if **you** retire, cease the private practice of law or leave the
**Named Insured** firm.  *You must have been continuously insured with **us** under
this **policy** or any prior **policy** issued by **us** for not less than 12 consecutive
months prior to the **policy termination date**.*

\*      \*      \*

## I.  CONDITIONS

\*      \*      \*

### 7.  RENEWAL

We may offer to renew this **policy** at the terms and rates applicable at the
expiration date.  We will not amend the **retroactive date(s)** *during a period of
continuous coverage.*

(Compl. at Ex. C) (bold in original, bolded terms denote terms defined in the 2003-2004 Policy)

(emphasis added).

## C.      Wiles' Notification to PDIC of the Illinois National's Claim

On September 1, 2004, just days after the Ohio Supreme Court issued its decision

affirming the dismissal of Illinois National's appeal, Wiles sent a letter to PDIC stating:

[W]e give notice of a potential claim on policy number 03OH10172200203 . . . . If
appropriate, we request that no investigation of this claim be done at this time
other than further explanations provided by the principles of Wiles Boyle.  Given

the nature of our relationship with the client, it is unlikely the claim will be pursued.

(Compl. at Ex. D).

PDIC responded with a September 15, 2004 letter, acknowledging receipt of Wiles' notice of the potential claim and specifically reserving its right to evaluate coverage and all other rights, policy terms, conditions, definitions and exclusions under the Policy.

Wiles sent PDIC another letter dated September 15, 2004, informing PDIC that Illinois National had implied by communication that Illinois National believed Wiles' attorneys had committed legal malpractice with respect to the underlying litigation. Prior to this time, Illinois National did not indicate in any way that it believed that any of the Wiles' attorneys had committed legal malpractice or that it was considering making a legal malpractice claim against Wiles. After this notification, in the fall 2004, PDIC representative, Steve Mitchell, was sent a complete copy of all the briefing in the Ohio Supreme Court. That briefing set out the chronology and whole history of the case.

On October 25, 2004, Illinois National made an initial $5 million settlement demand to Wiles. Then, on December 6, 2004, Illinois National raised its settlement demand to $10 million. The current settlement demand, as of the time of the parties' briefing is $10 million, which is twice the Policy limits.

On January 5, 2005, Mitchell was provided unsupervised access to the entire file at Wiles and met with Cook and Close. Wiles alleges that Mitchell would not have been given unsupervised access to the file with no legal representation for the firm had there been any indication that there was a coverage problem. At the January 5, 2005 meeting, Mitchell did not

indicate that there were any coverage problems or otherwise express any concerns about the alleged late notice of the claim.

On February 10, 2005, Mitchell responded to Illinois National's December 2004 $10 million settlement demand. His letter stated in part:

> . . . there is little more for us to discuss unless and until you express a willingness to renew your demand for $5,000,000. If you do that, we see an opportunity to come to a resolution that is both fair, certain and swift, since you have expressed a desire "to have this resolved shortly."

This letter contained no reference to a reservation of rights on coverage issues. Consistent with the letter, Close alleges that Mitchell assured him several times after this that the matter would be settled and that he was trying to line up reinsurers to make an offer of the policy limits. In his deposition, Close described his conversations with Mitchell as follows:

> A.    My recollection is that periodically we had discussions.
>
> Q.    All right. Anything of significance that you can recall?
>
> A.    Steve had been telling us all along he was going to get this case settled, we gotta get this case settled. We're going to pay them the money. And I'd asked, you know, when's it going to get over with?

(Close Depo. p. 66).

On May 2, 2005, Samuel Carucci, AIG's Director of Complex Claims, came to Columbus to meet with Mitchell and Close. Wiles' members and Carucci expected a settlement offer to be made at that meeting. Although no offer was made, Wiles alleges that Mitchell never raised any coverage issues.

A few months later, in July 2005, Close, on behalf of Wiles, signed a tolling agreement. Close avers that he relied on PDIC's assurances that the matter would be settled and that they

simply needed more time to settle the case. Close further avers that he would not have agreed to this tolling agreement had there been any notice from PDIC that there was a problem with coverage.

On August 19, 2005, PDIC sent Wiles a detailed reservation of rights letter based on PDIC's investigation of the claim subsequent to Wiles' submission of the claim. In this letter, PDIC expressly reserved all of its policy rights and defenses consistent with the terms, conditions, definitions and exclusions contained in the subject policies. Mr. Close described his reaction to this letter:

> Q. Part of your being upset was your perception that PDIC had, at least to some degree, misunderstood the nature of what had occurred?
>
> A. And they had sandbagged us. You know, we had opened our files to them in their entirety. We had cooperated above and beyond the call, done everything Steve Mitchell had asked, even though I think some of it was probably contrary to our interests. And now we get this reservation of rights, which is just hogwash.

(Close Depo. at 70).

On September 13, 2005, PDIC sent Wiles a letter offering to provide Wiles with defense counsel for Illinois National's malpractice claim, and again expressly doing so subject to PDIC's reservation of rights and defenses under the subject policies. Wiles accepted PDIC's offer of defense counsel. Defense counsel was retained to defend Wiles' interests in the Illinois National malpractice claim. PDIC continues to pay for Wiles' defense in the underlying case.[2]

In late September 2005, PDIC approached Close about extending the tolling agreement.

---

[2]On May 19, 2006, Illinois National filed suit against Wiles in Franklin County Court, case number 06 CV 006670. That case is currently pending.

In light of the newly disclosed coverage issue, Close refused to extend the agreement.

Section eight of the 2003-2004 Policy, titled "Policy Disputes," required "non-binding arbitration" to settle disputes. On November 8, 2005, PDIC and Wiles participated in mediation pursuant to Section eight's requirement and attempted in a good faith to negotiate a settlement. The parties were unable to come to a settlement at the mediation.

On March 23, 2006, PDIC informed Wiles that it interpreted the malpractice policy to exclude coverage because Wiles failed to give notice of Illinois National's potential claim either before the expiration of the 2002-2003 Policy or in its application for renewal. Six days later, on March 29, 2006, PDIC filed a Complaint For Declaratory Judgment, seeking a declaration by the Court that PDIC is under no duty to defend Wiles in a pending lawsuit in state court in Ohio, or to indemnify Wiles for any damages that may be awarded in that lawsuit, and that PDIC is entitled to reimbursement for its prior expenses in defense of that lawsuit. After this Court denied Wiles' motion to dismiss, Wiles answered PDIC's complaint and counterclaimed for breach of contract and bad faith relating to PDIC's actions pursuant to a professional responsibility insurance policy PDIC issued to Wiles, seeking "damages measured by any amounts ultimately owed to Illinois National for the Illinois National claims, without regard to policy limits," as well as punitive damages and attorneys' fees. The Court denied PDIC's motion to dismiss the counterclaims and its subsequent motion for reconsideration. PDIC has filed a Motion for Summary Judgment (Doc. 54), seeking judgment on its Complaint of Declaratory Judgment against Wiles. This motion has been fully briefed and is ripe for review.

## II.    SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which

provides:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine
> issue as to any material fact and that the moving party is entitled to
> judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[3] The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. *Id.* Stated otherwise, the Court must credit evidence

---

[3] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (*quoting Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (*quoting Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III.   DISCUSSION

As a preliminary matter, this case is before the Court on diversity jurisdiction, and

consequently, Ohio law applies. *See Erie R. Co. v. Tompkins*, 304 U.S. 69, 78 (1939); *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). *See also Celina Mut. Ins. Co. v. Sadler*, 6 Ohio App.2d 161, 165-166 (noting that an Ohio-issued policy is governed by Ohio law unless the provisions of the policy dictate otherwise). To determine the law of a particular state in a diversity case, federal courts look to the decisions of that state's highest court, and, if unavailable, decisions of the intermediate courts. *See Stoner v. New York Life Insurance Company*, 311 U.S. 464 (1940); *U.S. v. Simpson*, 2008 WL 877849 (6th Cir. 2008).

The at-issue insurance policies in the instant case—the 2002-2003 Policy and the 2003-2004 Policy—are "claims-made" policies. "In Ohio, under a claims-made policy, notice of an action against the insured must be presented to the insurer within the designated time of the policy." *Helberg v. National Union Fire Insurance Company*, 102 Ohio App.3d 679, 681 (6th Dist. 1995) (citing *A.C. Strip v. Home Insurance Co.*, 868 F.2d 181, 184 (6th Cir. 1989)). "The existence of a cut-off date is integral to a claims-made policy, as it is 'a distinct characteristic of such a policy that directly relates to rate setting.'" *Asp v. Ohio Medical Transportation, Inc.*, 2001 WL 721854 at *3 (Ohio App. 10 Dist.) (quoting *Checkrite Ltd., Inc. v. Illinois Nat. Ins. Co.*, 95 F.Supp.2d 180, 191-92 (S.D.N.Y.) (citation omitted)). This is contrasted with an occurrence policy, which provides coverage for acts done during the policy period regardless of when the claim is brought and is triggered by the event that gave rise to the claim rather than by the reporting of a claim. *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 298 n. 24 (1986); *Mueller v. Taylor Rental Ctr.*, 106 Ohio App.3d 806, 810 (1995) (citing *Strip*, *supra*).

PDIC contends that Ohio law requires this Court to find that there is no policy coverage under either the 2002-2003 Policy or the 2003-2004 Policy. To support this contention, PDIC

first argues that Wiles "had knowledge or information of specific circumstances which could have reasonably been expected to result in a claim" against the Wiles Firm during the 2002-2003 Policy period. PDIC then argues that because Wiles failed to report that claim to PDIC during the 2002-2003 Policy period, *Strip, supra,* supports its contention that there is no coverage. Wiles counters that it complied with the policies' reporting requirements. (Def.'s Memo. in Opp. at 10-19). Alternatively, Wiles argues that even if the Court finds that it was untimely in reporting its claim, the Ohio appellate court's holding in *Helberg, supra*, supports a finding of coverage. Wiles further argues in the alternative that estoppel operates to estop PDIC from denying coverage. (Def.'s Memo. in Opp. at 19-22). Finally, Wiles argues in the alternative that PDIC cannot deny coverage based upon late notice because PDIC cannot demonstrate prejudice. (*Id*. at 22-23). The Court first considers whether or not Wiles failed, as a matter of law, to comply with the policy's reporting requirement. Next, the Court considers whether Ohio case law provides a basis for coverage notwithstanding a finding of late notice. Finally, the Court considers whether, notwithstanding a finding of late notice, estoppel or lack of prejudice serve as a basis for precluding PDIC from denying coverage.

**A.    Timeliness of Wiles' Notification to PDIC of the Illinois National Claim**

The language of both the 2002-2003 Policy and 2003-2004 Policy limit coverage to claims that were made and reported by Wiles during the policy period. The policies indicate that a claim is made "when you first receive information or have knowledge of specific circumstances involving a particular person or entity which could *reasonably be expected to result in a claim*."[4] (Compl. Ex. C) (emphasis added). Additionally, question seven of the renewal application

---

[4]The 2002-2003 Policy language is substantively identical, replacing "Insured" for "you."

reminded Wiles to report to PDIC any "incident, facts, circumstances, acts or omissions" that "could reasonably be expected to result in a claim to PDIC." (Compl. Ex. B). Thus, the policy language required Wiles to report a claim to PDIC in the same policy period that Wiles became aware of circumstances that "could reasonably be expected" to result in Illinois National bringing a malpractice claim against it. It is undisputed that Wiles did not report a claim until after the 2002-2003 Policy period expired on November 15, 2003. The question for the Court is, as a matter of law, applying the policy language to the facts of this case, whether or not Wiles should have reported a claim before the expiration of the 2002-2003 Policy.

Wiles argues that the definition of when a claim is reported is ambiguous, and therefore, under Ohio law, should be construed in favor of coverage. Specifically, Wiles points out that the term "reasonably expected" is not defined. Wiles advocates for a construction of this language to mean that Wiles' firm members had to hold a reasonable belief that a claim would be made. Wiles then asks the Court to conclude that the reasonableness of the belief of the members of the Wiles firm cannot be determined as a matter of law under the existing circumstances because the reasonableness is a factual issue. PDIC contends that a mixed subjective/objective test should be utilized, and consequently, Wiles' members' subjective beliefs are not controlling. PDIC does not address Wiles' argument that the "reasonably expected" policy language is ambiguous. Instead, PDIC argues that Wiles "knew of the very real potential for a legal malpractice claim in March 2003," and therefore, as a matter of law, Wiles was contractually obligated to report a claim. (Pl.'s Mot. for Summ. J. at 18).

Wiles is correct that Ohio law requires any ambiguity in an insurance policy contract to be "liberally construed in favor of the insured." *Strip*, 868 F.2d at 185 (citing *Fuerstenberg v.*

*Mowell*, 63 Ohio App.2d 120, 122, 409 N.E.2d 1035 (1978); *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208 (1988); *Faruque v. Provident Life & Acc. Ins. Co.*, 31 Ohio St.3d 34 (1987)). The Court does not, however, agree with Wiles that this deference requires the Court to employ a purely subjective standard, asking only whether or not Wiles itself held a "reasonable belief that a claim would be made, and not anyone else." (*See* Defs.' Memo. in Opp. at 16-17).

The at-issue policy language— "when *you* first receive information or have knowledge of specific circumstances involving a particular person or entity which could reasonably be expected to result in a claim"—by using the word "you," introduces a subjective component given that the policy does not define the word "you." PDIC argues, and this Court agrees, that "the subjective component focuses on *what* the insured actually knew, and *when* in relation to the policy inception date." (Pl.'s Reply at 4). This does not mean, however, that the subjective component extends to the "reasonably expected to result in a claim" policy language. The policy language does not read "which *you* reasonably expected to result in a claim." PDIC opines, and again, this Court agrees, that "[t]he objective component focuses on whether, equipped with that information, the insured *reasonably* expected a claim to follow." (*Id*.). Thus, this Court will first determine what facts and circumstances Wiles was aware of and will then consider whether such facts and circumstances "could reasonably be expected to result in a claim."

The Court does find ambiguity, however, with the "reasonably expected" element. Throughout its briefing, PDIC either ignores this issue or implicitly advocates construing the phrase "reasonably be expected" to require reporting when there is any possibility of or potential for a claim. PDIC's position is not supported by the policy language, dictionary definition or case law. Though PDIC could have defined the phrase "reasonably be expected" to require reporting

of all possible claims, it did not, and instead, neither the 2002-2003 Policy nor the 2003-2004

Policy define the phrase. When a term or phrase is undefined in a policy, Ohio Courts often look

to the dictionary definition to give it its plain and ordinary meaning. *See Delli Bovi v. Pacific

Indemnity Co.*, 85 Ohio St.3d 343 (1999); *Ambrose v. State Farm Fire & Casualty*, 70 Ohio

App.3d 797 (9th Dist. 1990). The American Heritage Dictionary defines "expect" as follows: "To

look forward to the probable occurrence or appearance of; To consider likely or certain."

Similarly, Black's Law Dictionary defines "expect" as: "To await; to look forward to something

intended, promised, or likely to happen." This construction is consistent with that of other federal

courts construing such language in insurance policies. For example, in *City of Carter Lake v.

Aetna Casualty*, 604 F.2d 1052, 1059 (8th Cir. 1979), the Eighth Circuit Court of Appeals

interpreted the word "expected" for purposes of an exclusion in an insurance policy to denote

"substantial probability." *See also*, *General Star National Insurance v. Miller Law Firm*, 2007

WL 2782517 (W.D. Mo. 2007); *C. Raymond Davis & Sons, Inc. v. Liberty Mutual Ins. Co.*, 467

F.Supp. 17, 20-21, 30 (E.D. Pa 1979). Though not an Ohio case, the Court finds *Shaheen,

Cappiello, Stein & Gordan, P.A. v. The Home Insurance Company*, 719 A.2d 562 (N.H. 1998),

instructive on this issue.

In *Shaheen*, the Shaheen P.A. firm represented Coffin in the preparation of a prenuptial

agreement. *Id*. at 564. After executing the agreement, Coffin was married, but later consulted the

Shaheen P.A. firm for divorce proceedings. *Id*. At this time, the Shaheen P.A. attorneys realized

they omitted a key provision governing the dissolution of jointly-held property in a prenuptial

agreement. *Id*. The omitted provision was significant because there was a dispute over who

owned the marital home that was purchased with Coffin's funds. *Id*. In April 1991, the Shaheen

P.A. attorneys exchanged memoranda and discussed with Coffin the effect of the omitted provision and the possibilities of successfully arguing that the agreement, even without the omitted provision, mandated Coffin's entitlement to the home. *Id*. Coffin expressed confidence in the Shaheen P.A. attorneys' legal abilities and approved the firm's continuing representation in her divorce action. *Id*.

On November 15, 1991, the Shaheen P.A. firm applied for renewal coverage with their malpractice carrier. *Id*. The renewal application asked, "is any lawyer aware of . . . any incident, act, or omission which might reasonably be expected to be the basis of a claim or suit arising out of the performance of professional services for others." The Shaheen P.A. firm did not disclose the Coffin omission because it "believed that no claim would arise pending resolution of the interpretation of the prenuptial agreement." *Id*. In August 1992, a hearing was held, and a Shaheen P.A. attorney informed Coffin that she would have a potential malpractice claim if the hearing officer ruled in favor of equitable distribution. *Id*. In September 1992, the hearing officer concluded that the prenuptial agreement did not cover the disposition of the marital home. *Id*. In October 1992, Shaheen P.A. notified their malpractice carrier of a potential malpractice claim. *Id*. The malpractice insurer denied coverage. *Id*. at 565. The trial and appellate court ruled in favor of Shaheen P.A., finding that the Shaheen P.A. attorneys did not reasonably expect a claim or suit. *Id*. The malpractice insurer appealed to the New Hampshire Supreme Court, and that court also affirmed. *Id*.

The *Shaheen* claims-made policy required the insured, upon "becoming aware of any act or omission which would *reasonably be expected to be the basis of a claim or suit covered hereby,*" provide notice to the insurer as soon as practicable. *Id*. at 565. As in the instant case,

the *Shaheen* policy did not define the phrase "reasonably be expected." The New Hampshire Supreme court concluded that "the provision requiring the insureds to report any incidents which could 'reasonably be expected' to form the basis of a claim or suit is ambiguous." *Id*. at 566 (emphasis added). The *Shaheen* court explained:

> As drafted, the provision does not indicate whether notice to the insurer is required when all elements of a malpractice claim are present, or when, based on the parties and the circumstances, a malpractice claim on the merits is likely. Therefore, we apply the latter view, interpreting it in favor of providing coverage to the insured.

*Id*. The court further reasoned:

> By using the phrase "reasonably be expected," Home Insurance apparently requires that its insureds exercise professional judgment at several critical junctures. First, Home Insurance requires insureds to exercise their judgment before triggering the reporting requirement for potential claims. A similar ambiguity arises upon renewal, when Home Insurance requires its insureds to disclose "any incident, act or omission which *might reasonably be expected* to be the basis of a claim or suit arising out of the performance of professional services for others." (Emphasis added). The ambiguity in determining whether potential claims must be reported when renewing the policy is identical to the ambiguity in determining when to report a potential claim during the policy period.

> Accordingly, we agree with the trial court's determination that the plaintiffs acted reasonably in concluding that reporting was not required in May 1991 since a claim was not "reasonably . . . expected to be the basis of a claim or suit" until September 1992. If Home Insurance wishes to require reporting in every instance of an actual or a potential claim in order to guarantee coverage, it must use clear policy language to do so.

*Id*. at 566-67.

This Court, like the *Sheehan* Court, finds that phrase "reasonably be expected," as it is

used in the 2002-2003 and 2003-2004 Policies, is ambiguous.[5]  Consequently, pursuant to Ohio

law, the Court construes this phrase in favor of the insured, finding that the policy language only

required Wiles to report claims that were reasonably probable, reasonably likely to happen, or

reasonably certain.  As the *Sheenan* Court noted, if PDIC seeks to require reporting of every

possible or feasible claim, it must use clear policy language to do so.

Utilizing this construction, the Court rejects PDIC's argument that Wiles, as a matter of

law, failed to report a claim that was reasonably probable, reasonably likely or reasonably certain.

Instead, the Court concludes that whether or not Wiles acted reasonably in providing notice of a

potential claim remains a question of fact.  Pursuant to the methodology set forth above, the

Court, in reaching this conclusion, first considered the facts and circumstances Wiles was aware

of prior to the expiration of the 2002-2003 Policy.  Wiles' knowledge of the facts and

circumstances pertinent to this action are essentially undisputed.

Prior to the expiration of the 2002-2003 Policy, the underlying litigation remained

pending.  There existed a conflict in the appellate courts regarding the applicability of Ohio R.

Civ. P. 6(E).  That conflict had been certified to the Ohio Supreme Court and was awaiting the

Ohio Supreme Court's decision.  Wiles' members submitted testimony via deposition and affidavit

---

[5]The primary case relied upon by PDIC, *Liberty Surplus Insurance Corporation, Inc. v. Nowell Amoroso*, 189 N.J. 436, 916 A.2d 440), does not alter this Court's ruling.  *Liberty* is distinguishable because the insurance application in that case required the insured to report any circumstance or act that "could" result in a claim. *Id*. at 445.  This language implies "possibility" rather than probability.  Thus, the language is broader than the reasonably expected language in the PDIC policy.  *Liberty* is further distinguishable because it involved an underlying case that was complete, unlike this case, which was still pending before the Ohio Supreme Court on a certified conflict.  *See id*. at 450.  Finally, unlike the instant case, there was no evidence in *Liberty* regarding the absence of the client's expressions of dissatisfaction or of the existence of continuing referrals from the client.

indicating that they were confident that Illinois National would prevail in the Ohio Supreme Court based upon the language of the rule and because the only reported Ohio case and another unreported case supported their argument. Further, Illinois National had not indicated in any way that it believed that any of the Wiles' members had committed legal malpractice or that it was considering making a legal malpractice claim against Wiles, even after being notified of the Twelfth District Court of Appeals' partial dismissal of Illinois National's appeal.[6] Finally, AIG entities continued to send extensive work to the Wiles' members who handled the Illinois National litigation. Based upon these facts and circumstances, the Court cannot conclude that a malpractice claim against Wiles by Illinois National was reasonably probable, reasonably likely or reasonably certain prior to the expiration of the 2002-2003 Policy. Indeed, prior to the expiration of the 2002-2003 Policy, it was not even reasonably probable, reasonably likely or reasonably certain that Illinois National was going to loose the underlying suit.

The evidence presented by PDIC in an attempt to demonstrate that Wiles reasonably expected a malpractice claim does not persuade the Court otherwise. Specifically, PDIC references language from Wiles' appellate brief in the underlying action, comments made by Ohio

---

[6]Other courts, too, have recognized the importance of expressions of client dissatisfaction in this context. *See, e.g., General Accident Insurance Company v. Trefts*, 657 F.Supp. 164 (E.D. Mo. 1987) (citing *Freemont Indem. Co. v. Lawton-Byrne-Bruner Ins. Agency Co.*, 701 S.W.2d 737, 742-43 (Mo. App. 1985)) (construing a question on a malpractice insurance policy renewal form "to require disclosure of circumstances, acts, errors, or omissions that could result in a professional liability claim only in those circumstances when a client has given to the lawyer some indication through a complaint or expression of dissatisfaction with is services that a claim might or would be made"); *Westport Insurance Company v. Lily*, 292 F.Supp.2d 165, 173 n.11 (D.Me 2003) (finding persuasive the lack of evidence in the record that the client "ever demonstrated dissatisfaction with [its] representation prior to the effective date of the [at-issue policy]" ); and *General Star National Insurance v. Miller Law Firm*, 2007 WL 2782517 at *4 (W.D. Mo.) (noting, "it is difficult to find legal malpractice cases that hold that knowledge of a likely claim can be inferred when no client unhappiness has been expressed").

Supreme Court Justice Paul Pfeifer Judge during the April 28, 2004 oral argument in the underlying case, and deposition testimony from Samuel Carucci, AIG's Director of Complex Claims.

The language in the Wiles appellate brief cited by PDIC stated: "*If Appellee's motion [to dismiss] is granted*, this firm as well as other similarly situated firms will be subject to potential exposure for malpractice liability." (emphasis added). This statement does not, as PDIC suggests, amount to an admission that Wiles, at the time of briefing, expected a malpractice suit or even that one was probable at that time. Instead, it indicates only that Wiles was aware of the possibility of a malpractice suit "*If Appellee's motion to dismiss is granted*." Consistent with this interpretation, Wiles did in fact report the possibility of a malpractice suit after the Ohio Supreme Court issued its ruling in favor of appellee.

Likewise, Justice Pfeifer's comments at oral argument do not demonstrate that the facts and circumstances warranted a conclusion that a malpractice claim was reasonably certain prior to the expiration of the 2002-2003 Policy. Justice Pfeifer characterized the issue on appeal as a "narrow issue," stating "*If you lose on [the narrow issue]*, presumably your client will want to attempt to, or might want to attempt to assert a legal malpractice case." (Emphasis added). Again, this statement indicates exactly what Wiles' appellate brief acknowledged—if Wiles lost the issue on appeal, there was a possibility of a malpractice suit against Wiles.

Mr. Carucci's testimony cited by PDIC also fails to demonstrate that as a matter of law, Wiles expected or should have expected a malpractice claim prior to the 2002-2003 Policy's expiration date. Mr. Carucci testified by deposition that he became involved with the underlying litigation in July 2004. (Carucci Depo. at 7). He testified that after he obtained the file and

reviewed it, he believed that Wiles had engaged in legal malpractice. (*Id*. at 25). When asked if it was before or after the Ohio Supreme Court ruled, Mr. Carucci responded "I think it was before." (*Id*.). But, upon further questioning, Mr. Carucci confirmed that his predecessors made no mention of a malpractice claim and clarified his testimony:

> Q.    Did it come to your attention that your colleagues who were in charge of the file prior to your taking over at the time you indicated, did it come to you attention that they had any discussions or communications with representatives of the Wiles firm concerning the firm's potential malpractice liability to AIG?
>
> A.    No, there was no evidence of any of that.
>
> *    *    *
>
> Q.    *Would I be correct then that the date on which you first had a concern that the Wiles Boyle firm had missed a filing deadline for any motion or brief would have been on or after August 18, 2004?*
>
> A.    *That would be correct.*

(*Id*. at 60) (emphasis added).

Though the Court is not basing its denial of PDIC's Motion for Summary Judgment on PDIC's behavior in handling Wiles' claim, the Court finds that PDIC's behavior belies its contention that any reasonable attorney would have reasonably expected a malpractice claim prior to the expiration of the 2002-2003 Policy period. In September 2004, approximately two weeks after the Ohio Supreme Court's ruling against Illinois National, PDIC representative Steve Mitchell received initial notification from Wiles regarding a potential claim. Mitchell received a complete copy of all the briefing in the Ohio Supreme Court, which set out the chronology and whole history of the underlying litigation. In December 2004, Mitchell received copies of all of Wiles' reports to Illinois National. Then, on January 5, 2005, Mitchell was provided unsupervised

access to the entire file at the Wiles firm and met with the Wiles' attorneys that handled the underlying litigation. At this meeting, which took place approximately four months after Mitchell received notification from Wiles, Mitchell did not disclose that there were any coverage problems, nor did he express any potential issues with the timeliness of Wiles' claim notice to PDIC. Mitchell also received copies of reports Wiles provided to Illinois National. Thus, Mitchell had a complete history of the case, the relevant decisions in the case, and the full chronology of the case. Despite this, PDIC did not even mention to Wiles that there may be coverage problems. Instead, it began settlement discussions with Mr. Carucci. On February 10, 2005, Mitchell responded to a settlement demand from PDIC by letter, suggesting a monetary figure that would encourage settlement:

> . . . there is little more for us to discuss unless and until you express a willingness to renew your demand for $5,000,000. If you do that, we see an opportunity to come to a resolution that is both fair, certain and swift, since you have expressed a desire "to have this resolved shortly.

The letter did not reference a reservation of rights on any coverage issues and led the parties to believe that PDIC would pay the claim. Mitchell subsequently assured Wiles several times that the matter would be settled and that he was trying to line up reinsurers to make an offer of the policy limits. In his deposition, Mr. Close described his conversations with Mitchell as follows:

A.    My recollection is that periodically we had discussions.

Q.    All right. Anything of significance that you recall?

A.    Steve had been telling us all along that he was going to get this case settled, we gotta get this case settled. We're going to pay them the money. And I'd asked, you know, when's it going to get over with?

(Close Depo. at 66). In May 2005, nearly eight months after Wiles notified PDIC of a potential

claim, Mr. Carucci came to Columbus to meet with Mitchell and Close. Wiles and Carucci expected a settlement offer to be made at that meeting. (Carucci Depo. at 62). Though no settlement offer was made, Mitchell never raised coverage issues. Not until August 15, 2005, nearly a year after Wiles notified PDIC of a potential claim, did PDIC present to Wiles a detailed letter raising coverage issues. After being fully aware of all of the facts necessary to make a coverage determination for months, PDIC's behavior—drafting settlement correspondence, attending settlement conferences, assuring Wiles that PDIC was going to pay Illinois National, etc.—undermines their argument that any reasonable attorney would have reasonably expected a malpractice claim prior to the expiration of the 2002-2003 Policy period. If the issue was as clear-cut as PDIC suggests, PDIC's behavior is puzzling to say the least.

In summary, viewing all of these facts and circumstances in the light most favorable to Wiles, and considering the Court's construction of the at-issue policy language, the Court cannot conclude as a matter of law that a malpractice claim was reasonably expected prior to the 2002-2003 Policy's expiration date. Therefore, Wiles' failure to report a suit or claim during the 2002-2003 Policy, or in response to question seven on its renewal application, does not result in this Court interpreting the 2003-2004 Policy to exclude coverage as a matter of law. Accordingly, the Court denies PDIC's motion for summary judgment.

**B.      *Strip, Helberg* and *Asp***

Even if, however, this Court were to come to the conclusion that Wiles' notice of the claim was late, a grant of summary judgment in PDIC's favor would not be automatic. Wiles contends that even if its notice was untimely, *Helberg*, *supra*, supports a finding of coverage. PDIC disputes this and argues instead that *Strip, supra*, is controlling and entitles it to judgment

in its favor and against Wiles.  A review of Ohio case law on this issue is warranted.

In *Strip*, the insured had purchased two claims-made policies. 868 F.2d at 183.  The first claims-made policy was issued by Pacific Employers Insurance Company and had a policy period from August 2, 1984 through August 2, 1985. *Id*.  Upon expiration of the policy period, the *Strip* insured did not renew the Pacific policy, but instead purchased another claims-made policy from a different insurer, Home Insurance Company, which had a policy period from August 2, 1985 through August 2, 1986. *Id*.  The *Strip* parties did not dispute that prior to the expiration date of this first claims-made policy (the Pacific policy), on July 26, 1985, a claim was made against the insured.  The *Strip* insured, however, did not notify Pacific until more than two weeks after the expiration of the first claims-made policy.  *Id*. at 185.  Pacific denied coverage based upon the policy language, which clearly provided that coverage only applied to claims that were both made and reported during the policy period. *Id*.  Home, too, denied coverage to the insured based upon similar policy language. *Id*.

The Sixth Circuit Court of Appeals, applying Ohio law, affirmed the trial court's judgment in favor of Pacific and against the insured. *Id*. at 185, 190  In doing so, the Court considered the policy language, the prejudice to the insurer of delayed notice, and the windfall to the insured of granting an extended period of coverage. *See id*. at 186-87.  For example, the Court reasoned that the policy language which required the insured to notify the insurer of claims "as soon as practicable" was language included to prevent a delay in reporting "when such delay would cause prejudice to the insurer." *Id*.  The Court further opined:

> Claims made policies, unlike occurrence policies, are designed to limit liability to a fixed period of time. To allow coverage beyond that period would be to grant the insured more coverage than he bargained for and paid for, and to require the insurer to provide coverage for risks not assumed.

*Id*. at 187.

The Sixth Circuit also affirmed the trial court's judgment in favor of Home and against insured, citing "the plain language of the Home policy," which required that "even for acts occurring prior to the policy period, the claim must be 'made against the insured *during* the policy period.'" *Id*. at 189.

Six years later, an Ohio appellate court considered similar facts, but reached a different conclusion. *See Helberg*, 102 Ohio App.3d 679 (1995). In *Helberg*, as in *Strip*, the insured purchased two claims-made policies. 102 Ohio App.3d at 681. The original claims-made policy provided coverage from December 11, 1991 through December 11, 1992. *Id*. And, just as in *Strip,* it was undisputed that the *Helberg* insured was aware of a claim against him on October 21, 1991 (during the period of the original policy period), yet he did not notify the insurer until January 21, 1992, nearly six weeks after the original policy period had ended. *Id*. Unlike the *Strip* insured (who purchased a policy from a different insurer upon expiration of the original policy), however, the *Helberg* insured, upon expiration of the original policy, purchased a renewal of his claims-made policy, with the second policy providing coverage from December 11, 1992 through December 11, 1993. *Id*. The *Helberg* court noted that this renewal "ensured the [the insured] was covered by malpractice insurance at all [relevant] times . . . and that his insurance was always with the same company." *Id*. The appellate court stated that the issue before it was "whether the insurer must provide coverage if notice is provided within a reasonable amount of time after the

insured is notified of the claim and the coverage is renewed, even if the notice given to the insurer occurred after the original policy period ended." *Id.* at 680. The trial court held that coverage denial was proper under the foregoing circumstances and granted summary judgment in the insurer's favor and against the insured. *Id.* The appellate court reversed the trial court. *Id.* at 683.

In reaching this conclusion, the *Helberg c*ourt acknowledged that in Ohio, claims-made policies require notice of a claim during the effective dates of the policy. *Id.* at 681. The court also discussed and distinguished two other cases applying Ohio law to similar facts. *Id.* at 681-82. The court first discussed *Strip*, but concluded that *Strip* was distinguishable because the *Strip* insured "changed insurance companies between the time he became aware of the claim against him and the time he notified his insurance carrier of the claim." *Id.* The *Helberg* court explained that in *Strip*, because of the change in insurance companies,

> the first carrier denied coverage because the insured presented the claim against him after the policy had expired. Understandably, his second claims-made insurer denied coverage because the claim was made during the policy period covered by its predecessor. The first insurer denied coverage because, as here, the policy called for claim notification during the policy period or the purchase of an extended reporting period which [the *Strip* insured] had failed to purchase.

*Id.* 681-82.

Next, the *Helberg* court explained that *Kaiser v. Wood*, Lucas App. No. L-91-043 (Jan. 10, 1992) (unreported), like *Strip*, was distinguishable. *Id.* at 682. In *Kaiser*, an attorney had a claims-made policy which had been cancelled for failure to pay premiums. After the policy's cancellation, a legal malpractice claim was brought against the attorney. As is the case with claims-made policies, the *Kaiser* policy coverage was conditioned on the insurer's notification of

the claim during the policy period.  Since the claim and subsequent notification were made after the cancellation of the policy, the *Kaiser* appellate court affirmed the trial court's denial of insurance coverage.

After discussing *Strip* and *Kaiser*, the *Helberg* court advanced two reasons why it reached a different result with respect to the *Helberg* insured.  First, the court advanced a policy justification:

> In the present case, there was no cancellation of coverage, nor did the insured change insurance carriers.  The insured merely renewed his claims-made policy. *Such an event should not precipitate a trap wherein claims spanning the renewal are denied.*

*Id*. (emphasis added).  In addition to this policy justification, the *Helberg* court noted that its holding was also supported by the language of the at-issue policy. *Id*.  Specifically, the court noted that though the "coverage" section of the policy clearly required claims to made and reported during the same policy period, ambiguity was introduced in the "exclusions" section which contained the phrase "continuously renewed thereafter." *Id*.  The *Helberg* court opined that "[t]his language indicates that the parties expected the coverage to be continuous if the policy was renewed at each successive policy expiration." *Id*.  Based upon this ambiguity, the *Helberg* court, citing Ohio authority, held that the "contract should be construed in favor of . . . the insured." *Id*. (citing *King v. Nationwide Ins. Co.* 35 Ohio St.3d 208 (1988); *Faruque v. Provident Life & Acc. Ins. Co.*, 31 Ohio St.3d 34 (1987)).  In addition, the *Helberg* court pointed out that the coverage section of the policy required the insured to "notify the insurer of a claim during the policy period or during an extended reporting period 'purchased in accordance with [the extended reporting endorsement provision].'" *Id*. at 682-83.  The extended reporting endorsement

provision "unambiguously" set out only two circumstances when the purchase of an extended endorsement is necessary to maintain coverage—when a policy had been cancelled (as in *Kaiser*) or when the policy had not been renewed by either party (as in *Strip*). *Id.* at 683. Relying on Ohio case law regarding insurance contract construction and the *expressio unius est exclusion alterius* cannon of construction, the *Helberg* court concluded that because the insured had renewed the policy rather than non-renewal or cancellation, coverage should not be denied:

> In determining the meaning of an insurance contract, we are directed to read the contract as a whole giving meaning to every provision contained therein. *Farmers Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834, paragraph six of the syllabus. The Supreme Court of Ohio has stated "[I]f one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain." *Id.*
>
> \*        \*        \*
>
> Applying the time-honored maxim of construction, *expressio unius est exclusio alterius,* the inclusion of specific things implies the exclusion of those not mentioned, this court can only conclude that the inclusion of "non-renewal" of the policy as one of those circumstances demanding the purchase of an extended reporting endorsement excludes a "renewal" as a circumstance which demands such a purchase. Since [insured's] position here was a renewal rather than a "non-renewal" or "cancellation," this court concludes that the language of the contract does not deny coverage in this context.
>                                                              .

*Id.* at 682-83.

After *Helberg*, another Ohio appellate court has passed on similar facts, again reaching a different conclusion. *See Asp v. Ohio Medical Transportation, Inc.,* 2001 WL 721854 (Ohio App. 10 Dist.). In *Asp*, as in *Helberg* and *Strip*, the insured purchased multiple "claims-made" policies. *Id.* at \*1. The original policy provided coverage from April 3, 1996 through April 3, 1997. *Id.* The *Asp* insured renewed the policy on a yearly basis through April 3, 1999. *Id.* In

March 1997, the insured received notice of a potential claim. *Id.* The *Asp* policy indicated that coverage only applies if the claim was made during the policy period and was reported to the insurer no later than sixty days after the expiration of the policy period. The *Asp* insured did not report the potential claim until an actual complaint was filed against it in Franklin County Court of Common Pleas, which was five months later and more than sixty days after the policy period. *Id.* The *Asp* insurer, after learning that insured received notice of the potential claim during the prior policy period, refused to provide coverage, asserting that insured had failed to abide by the terms of its claims-made policy. *Id.* The trial court agreed, entering judgment in favor of the insurer. *Id.* The appellate court affirmed. *Id.* In reaching its conclusion, the appellate court distinguished *Helberg* by noting that the *Asp* policy, unlike the *Helberg* policy, did "not contain a 'continuously renewed thereafter' clause." *Id.* at *4. The *Asp* court did not address the policy justification advanced by the *Helberg* court and rejected the *Asp* insured's arguments that the *Asp* policy's extended reporting endorsement provision supported coverage in the context of renewal. *Id.*

The facts and circumstances of the instant case most closely mirror those in *Helberg* and are distinguishable from those in *Strip* and *Asp*. Specifically, PDIC maintains that Wiles provided late notice of its claim, a fact that was present and undisputed in *Helberg*. And, as did the insured in *Helberg*, Wiles renewed his policy with PDIC such that it had malpractice coverage with PDIC throughout all relevant times. Consequently, the policy justification advanced by the *Helberg* court in support of its decision to find coverage—"renewal of a policy should not precipitate a trap wherein claims spanning the renewal are denied"—applies equally here. *See*, 102 Ohio App.3d at 682. This distinguishes the instant case from *Strip*. The *Asp* court did not explicitly reject the *Helberg* court's policy justification, but instead distinguished *Helberg* on the grounds

that the *Helberg* policy contained the phrase "continuously renewed thereafter" in its "exclusions" section. 2001 WL 721854 at *4. A similar phrase is found in the renewal sections of both the 2002-2003 and 2003-2004 Policies: "during a period of continuous coverage." (Compl. Exs. A and C). The inclusion of this language distinguishes the instant case from *Asp*. Thus, the holding of *Helberg* is instructive in the instant case.

*Helberg* does not, however, as Wiles suggests, stand for the proposition that an insured can provide notice whenever as long as the policy is renewed. The *Helberg* court indicated that the question before it was "whether the insurer must provide coverage *if notice is provided within a reasonable amount of time after the insured is notified of the claim* and the coverage is renewed, even if the notice given to the insurer occurred after the original policy period ended." 102 Ohio App.3d at 680 (emphasis added). In *Helberg*, the court specifically noted that the late notice in *Strip* was not reasonable because it resulted in prejudice to the insurer. Generally, reasonableness of late notice is a fact issue. The Court sees no reason to depart from that rule here.

In summary, even if the Court were to conclude that Wiles' notice of the claim was late, *Helberg* provides a basis for coverage *if* Wiles provided notice within a reasonable amount of time. For this additional reason, the Court denies PDIC's Motion for Summary Judgment.

## C.     Estoppel and Prejudice

As alternative grounds for denial of PDIC's motion for summary judgment, Wiles argues that estoppel operates to estop PDIC from denying coverage. In addition, Wiles contends that PDIC cannot avoid coverage based upon the alleged late notice because PDIC cannot demonstrate that it was prejudiced by the alleged late notice, a showing Wiles maintains Ohio law

requires.

Having determined that summary judgment in favor of PDIC and against Wiles is not warranted, the Court finds it unnecessary to address Wiles' alternative estoppel and prejudice arguments.

## IV.    DISPOSITION

Based on the foregoing, the Court **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 54).

The Clerk shall remove Document 54 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**